UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOWARD E. YODER and
DEBBIE L. YODER,

    Plaintiffs,

v.

Case No. 1:05-cv-407
Hon. Hugh W. Brenneman, Jr.

WATERFIELD FINANCIAL CORPORATION,
and UNION FEDERAL BANK,

    Defendants.

_____/

**OPINION**

Plaintiffs have filed a complaint against defendants Waterfield Financial Corporation ("Waterfield") and Union Federal Bank for violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 *et seq.*, violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, and for common law fraud. This matter is now before the court on defendants' motion for summary judgment (docket no. 38). For the reasons stated below, defendants' motion will be granted.

    **I.**    **Background**

In 2003, plaintiffs entered into a contract with a builder to construct a house on land that they owned. Compl. at ¶ 7. The builder referred plaintiffs to Waterfield to finance the construction and to obtain a 30-year mortgage following the construction. *Id.* at ¶¶ 8-9. Plaintiffs' financing involved two different loans: a construction loan and a permanent loan after the house was built. Bennett Dep. at 27-29.[1] Plaintiffs applied for these loans in a "Uniform Residential Loan

---

[1] The parties have submitted copies of deposition transcripts for three witnesses : Howard Yoder (June 23, 2006), Debbie Yoder (June 23, 2006), and Tina Bennett (June 27, 2006). These depositions and

Application" ("application") dated April 10, 2003. Def. Exh. 2.[2] The application identified the property as being purchased in 2002 at an original cost of $15,000.00. *Id.* The cost of the proposed improvements was set at $107,942.00, resulting in a transaction "purchase price" of $122,942.00. *Id.* Plaintiffs did not identify any liens on the property. *Id.* The application requested a 360-month fixed rate FHA loan in the amount of $112,098.00, at an interest rate of 4.00%. *Id.*

On that same date, defendants prepared a "Good Faith Estimate of Settlement Costs" ("Good Faith Estimate"), a preliminary "Truth in Lending Disclosure Statement" ("preliminary TILA disclosure"), and a "Loan Financing Agreement."[3] Def. Exhs. 6, 7 and 8. The Good Faith Estimate reflected the same financing terms as the application and further specified that plaintiffs would receive a fixed FHA loan with estimated monthly payments of $718.83. Def. Exh. 6. This monthly payment included: mortgage principal and interest ($535.18); hazard/flood insurance ($25.00); real estate taxes ($113.00); and mortgage insurance ($45.65). *Id.*

The preliminary TILA disclosure identified the credit to be extended as an FHA loan with an amount financed of $106,776.21, an annual percentage rate (APR) of 4.429% with a total finance charge of $86,485.83. Def. Exh. 7.[4] The payment schedule reflected eight different monthly payment amounts: 12 payments of $461.82; 12 payments of $461.03; 12 payments of 579.18; 12

---

accompanying exhibits have been filed under seal. The court will refer to page citations in the depositions as follows: "H. Yoder Dep. at __," "D. Yoder Dep. at __," and "Bennett Dep. at __."

[2] The court will refer to exhibits attached to defendants' supporting brief as "Def. Exh. __" and to exhibits attached to plaintiffs' response as "Pltf. Exh. __."

[3] It is undisputed that defendant Waterfield prepared the documents for the lender, Union Federal Bank.

[4] For purposes of the preliminary TILA disclosure, the "amount financed" is defined as "the loan amount applied for less the prepaid finance charges" as set forth in the Good Faith Estimate. *See* Def. Exh. 7. In addition, the APR "is not the Note rate for which the borrower applied," but rather "the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge." *Id.*

2

payments of $578.28; 12 payments of $577.35; 12 payments of $576.39; 8 payments of $575.38; and 280 payments of $535.18. *Id.*

The parties' loan financing agreement stated a loan amount of $112,098.00, to be paid by a 30-year loan identified as a "Fixed Rate, Insured by the Federal Housing Administration (FHA)." Def. Exh. 8. Under the terms of the loan financing agreement, plaintiffs deferred locking into an interest rate during the application process:

> You have elected not to choose your interest rate and points at this time. You agree to choose your rate and points and complete a written amendment to this agreement prior to closing at a rate and points we are then offering. This decision may be made at any time during the period of loan processing; but no later than five (5) business days prior to your scheduled closing.

*Id.*

Plaintiffs' option to defer choosing an interest rate during the application process, and to "float" their interest rate prior to closing, was explained consistent with a "welcome letter" from Waterfield, which stated as follows:

> LOCK-IN: You have the option of locking your loan at application or you can elect to "float" your interest rate. A floating rate is not locked and is subject to change up or down with the daily market. Waterfield does offer you the flexibility of "floating" your rate up until 5 days prior to closing. However, your rate MUST be locked for 5 days prior in order to allow the closing documents to be printed. ***It is your responsibility*** to consult with your loan officer when you wish to be "locked in."

Def. Exh. 5 (emphasis in original).

The language in the loan financing agreement is also consistent with the fact that plaintiffs sought to finance new construction. Ms. Tina Bennett, a loan officer and branch manager for Waterfield (and its successor corporation American Home Mortgage), testified that plaintiffs could not lock into a permanent interest rate until the construction neared completion:

3

> [W]e would not close the permanent financing of the loan until the house was finished. So we would not lock an interest rate in until we knew when the house would be finished because the lock expiration date would have to be later than the closing date.

Bennett Dep. at 27-28.

The loan financing agreement also included a "temporary interest rate buydown" which provided as follows, "Your monthly payments will be reduced in accordance with a temporary interest rate buydown agreement that we will furnish to you in connection with your application." Def. Exh. 8. Ms. Bennett testified that "[a] buydown is a 30-year fixed rate program where for the first two years their interest rate is bought down, so that in year one and year two they are paying lower payments than what they will pay in years three through thirty." Bennett Dep. at 10. A "preliminary buydown plan payment schedule" attached to the loan financing agreement listed a mortgage amount of $112,098.00, a note rate of 4.000% with the following monthly payments: months 1 to 12 ($416.18); months 13 to 24 ($416.18); and months 25 to 360 ($535.18). Def. Exh. 8.

Christine Habig, on behalf of Waterfield, signed the loan application, preliminary TILA disclosure, Good Faith Estimate and loan financing agreement on April 10, 2003. Plaintiff Howard E. Yoder signed the documents on April 13, 2003, and plaintiff Debbie L. Yoder signed the documents on April 14, 2003. Def. Exhs. 2, 6, 7 and 8.

Howard Yoder testified his belief that he had a binding contract with Waterfield when he signed the April 10, 2003 documents. H. Yoder Dep. at 14. However, he admitted that he did not read portions of the Good Faith Estimate and did not inquire about disclaimers in the preliminary

4

TILA disclosure (e.g., "THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND" and the notation that the disclosure was "preliminary"). H. Yoder Dep. at 15, 21-23.

Defendants have provided copies of internal computer records, known as "conversation logs," which reflect that on April 16, 2003, Waterfield personnel noted that the "buydown" on plaintiffs' proposed loan was not correct. Def. Exh. 10. On April 17, 2003, Waterfield personnel stated as follows:

> Corrections have been made to the buydown. Solutions shows note rate of 6% with qualifying rate of 4% and buydown is 2/1 being paid by borrower. Loan is floating so this will need to be reviewed once loan is locked.

Def. Exh. 11. "Solutions" is a computer program used by Waterfield to determine "qualifying rations and payments, and information of that sort." Bennett Dep. at 26. Ms. Bennett testified that based on the information in the conversation log, plaintiffs would be able to get 4.0% interest rate the first year, 5.0% interest rate the second year and 6.0% thereafter. *Id.* at 27.

On May 15, 2003, defendants issued a "Notice of Loan Approval" (sometimes referred to as "the Notice"), which listed a "sales price" of $126,997.00 and a "loan amount" of $116,884.00. Def. Exh. 12. Both the sales price and the approved loan amount set forth in the Notice exceeded the amounts reflected in the April 10, 2003 documents. Nevertheless, the Notice incorporated the terms of the loan financing agreement:

> Your mortgage loan application has been underwritten and approved for the product terms previously outlined in the Loan Financing Agreement you executed with us.
>
> As you were advised at the time of the application, this Notice of Loan Approval does not obligate us to make a loan until (1) all conditions of this loan approval are met and accepted by us at closing; and (2) an acceptable appraisal is received and any conditions are met; and (3) the loan actually funds. To insure a timely and problem free closing please review and comply with the terms and conditions below. If the loan amount or funds needed to close increase, the loan may need to be re-underwritten.

5

\*       \*       \*

> Your loan approval is valid for 90 days from this date. Your credit documents (verifications of employment, pay stubs, bank verifications, bank statements or credit reports) are valid for 90 days (180 days if new construction) from the document dates, at which time re-verification of credit documentation may be necessary. However, if any changes occur to your financial status prior to closing, you are obligated to notify us of these changes immediately. These changes may necessitate re-underwriting for loan approval.
>
> In addition, if you fail to perform any of your obligations hereunder, if any of the approval conditions are not met, or if new data is obtained which adversely affects the documentation upon which the loan approval was based, this approval will be null and void.

*Id.* The Notice required that plaintiffs meet two conditions within seven days and an additional thirteen conditions prior to or at closing. *Id.*

The record reflects that Waterfield obtained a credit report dated May 16, 2003, which it used in connection with the transaction. Def. Exh. 4.

Plaintiffs started to look for a builder on June 5, 2003. Def. Exh. 17. Neither party has provided the court with a copy of the promissory note for the construction loan. In their brief, defendants merely state that "in April of 2003 [p]laintiffs executed the necessary documents for the construction loan only and did not lock in an interest rate for their permanent financing loan." Def. Brief at 5-6. Ms. Bennett testified that plaintiffs could not close on their permanent financing until construction on the new home was completed. Bennett Dep. at 28. She further testified that plaintiffs were not required to finance their permanent loan through Waterfield, but they could shop around for a loan from a different lender. *Id.* at 29. However, if plaintiffs decision to use another

lender was not without consequences. In the loan financing agreement, plaintiffs represented that they would not make out another loan application during the pendency of that agreement.[5]

Plaintiffs contacted Waterfield on November 4, 2003 with respect to the closing, and were advised that "they were working on it." Def. Exh. 17. On December 17, 2003, Waterfield advised plaintiffs that they received an occupancy permit and gave the builder their final check. *Id.* Plaintiffs house was built on December 22, 2003. H. Yoder Dep. at 30. By this time, the Notice of Loan Approval from May 13, 2003 had expired by its own terms. Def. Exh. 12.

Plaintiffs state that on December 23, 2003, defendants advised them that "our loan had expired" and that "[i]f we want to close the loan we needed to show $7,000 in the bank and show how it got there." Def. Exh. 17.

Defendants obtained a new credit report for plaintiffs dated December 30, 2003. Def. Exh. 4. In their brief, defendants state that a credit report from December 2003 reflected that plaintiffs had a vehicle voluntarily repossessed, that they had to pay a bank $7,000.00 to settle the account, and that they had been late on three different credit cards. Def. Brief at 6. However, the record reflects that plaintiffs took steps to clear their credit prior to that date. Def. Exh. 14, 15. On or about December 29, 2003, at the request of Christine Habig, plaintiffs submitted a letter from National City Bank stating that it received a payment of $7,000.00 to settle a claim on an account, and a letter explaining that the late payments on three credit cards were resolved. Def. Exhs. 14, 15; H. Yoder Dep. at 29-33. Howard Yoder explained that their 1998 GMC Jimmy was repossessed and

---

[5] The loan financing agreement provided in pertinent part that plaintiffs "acknowledge that Lender will expend substantial time and effort in processing your loan application and to induce the Lender to expend such effort you represent and warrant to lender that you have not made a loan application to another lender for the same transaction and will not do so while this agreement is in effect." Def. Exh. 8.

auctioned, resulting in a $7,000.00 debt owed to National City Bank. H. Yoder Dep. at 32-33. He also acknowledged that they made late payments on three accounts due to an address change. *Id.* at 29-30.

It appears that the closing on the permanent loan was delayed due to a number of liens on the house from subcontractors. *See* H. Yoder Dep. at 41-43; D. Yoder Dep. at 29; Def. Exh. 17.

On February 12, 2004, plaintiffs told Waterfield that they had $7,000.00 in the bank. *Id.* Waterfield advised plaintiffs that they were working on the closing. *Id.* Defendants obtained another credit report dated March 26th. Def. Exh. 18. This credit report reflected that plaintiffs had incurred more debt. Def. Exhs. 3 and 4. Ms. Bennett testified that the changes in plaintiffs' credit worthiness rendered them unqualified for an FHA loan. Bennett Dep. at 52-53.

On April 22nd, plaintiffs spoke with Randi Baker at Waterfield regarding the closing. Def. Exh. 17. Randi told them that she was working on it. *Id.* When asked about closing costs, she referred them to the Good Faith Estimate. *Id.*

On May 3rd plaintiffs asked Randi about the closing. *Id.* Randi replied that she was trying to contact the builder. *Id.* On May 12th plaintiffs called Randi about the closing and she stated that the closing costs should be the same as on the Good Faith Estimate. *Id.*

On June 1st, Randi called plaintiffs and advised them that the closing was scheduled for the first week in June. *Id.* On June 14th, plaintiffs advised Randi that they had paid off the liens. *Id.* Randi said they could close in about a week, and advised them that the closing cost and house payment would be the same as in the Good Faith Estimate. *Id.* Randi called plaintiffs on June 18th to advise them that the closing was scheduled for June 30, 2004 at the Chicago Title Office in

Coldwater. *Id.* When asked "how much our house payments would be," Randi told plaintiffs to look at their Good Faith Estimate. *Id.*

On June 30, 2004, Randi told plaintiffs that their house payments would be "around $700 or so." *Id.* However, the loan documents executed on June 30, 2004 reflect that plaintiffs would have a higher monthly payment. Plaintiffs executed a new "Uniform Residential Loan Application," in which they applied for a 30-year, fixed rate conventional loan in the amount of $119,665.00, bearing an interest rate of 7.625%. Def. Exh. 21. The new application did not include a request for an FHA loan. *Id.* The new "Truth-in-Lending Disclosure Statement" stated that the amount financed was $115,621.05 with an annual percentage rate of 8.576%. Def. Exh. 22. The loan was payable in monthly installments as follows: 24 months ($1,026.48); 96 months ($948.77); 17 months ($789.21); and, 223 months ($769.27). *Id.* A "Loan Financing Agreement Addendum" states that plaintiffs will receive a 30-year fixed rate conventional loan of $119,665.00, bearing an interest rate of 7.625%, with discount points equal to 3% of the loan amount. Def. Exh. 20. The loan financing agreement addendum would terminate if the loan did not close by July 14, 2004. *Id.* This appeared to be the "written amendment" contemplated in the original loan financing agreement. *See* Def. Exh. 8.

Plaintiffs executed a note dated June 30, 2004, payable to defendant Union Federal Bank, in the amount of $119,665.00 bearing an interest rate of 7.625%. Def. Exh. 25. Under the terms of the note, plaintiffs agreed to make monthly payments in the amount of $ 846.99. *Id.* Plaintiffs also signed a "Payment Letter" on that date, in which they agreed to make an initial payment of $1,225.78 consisting of: principal and interest ($846.99); hazard insurance ($36.09); PMI/FHA Insurance ($179.50); and taxes ($163.20). Def. Exh. 26.

9

Plaintiffs also executed a "Timely payment rewards addendum to note," in which defendants agreed to decrease the note rate by 1.00% if plaintiffs demonstrated a "good payment history." H. Yoder Dep. Exh. 17.

Plaintiffs called Randi from the closing and asked her why the loan payments were so high. *Id.* Randi said "she had to do some changing and that's the best she could do." *Id.* She would talk to Christine Habig and "see what she could do." *Id.* Plaintiffs called Randi again from the closing to "let her know we were not happy with our loan and we have questions." *Id.* Randi said she would speak to Christine Habig. *Id.*

Howard Yoder testified that they signed the closing papers on June 30, 2004. H. Yoder Dep. at 50. He testified that the closing was "kind of going quick." *Id.* He felt that "[w]e had to do it that day or everything was expired on July 1st." *Id.* Ms. Habig had previously told plaintiffs that if they had not signed the loan on that date, they "could lose the house." *Id.* at 50-52. Howard Yoder understood that he agreed to an interest rate of 7.625%, but felt that it was only "for that time being [sic]." H. Yoder Dep. at 58. He "was hoping Waterfield would get it straightened out the way they said it was going to be and not what it ended up being," that Waterfield would "get it fixed," and expected the monthly payment to come down. *Id.* at 58-59.

On July 1st, plaintiffs called Christine Habig. Def. Exh. 17. Christine told them that she did her best and that plaintiffs "were even lucky to get a loan." *Id.* Plaintiffs made one payment on the loan. H. Yoder Dep. at 69. Plaintiffs refinanced the loan on September 24, 2004, when they closed on a $124,000.00 loan with Nation's One Mortgage Corporation ("Nation's One").[6] Def. Exh. 27, 36. This loan was for a term of 360 months, with an interest rate of 6.25%

---

[6] This loan was payable to Washington Mutual, Dallas RPC. Def. Exh. 27.

10

and monthly payments of $868.25 (including principal, interest, hazard insurance and taxes). Def. Exh. 27. On or about November 7, 2004, plaintiffs filed a voluntary petition for bankruptcy under Chapter 7. Def. Exh. 28. *In re: Howard E. Yoder and Debbie L. Yoder*, No. 04-13456 (Bank. W.D. Mich.). The Bankruptcy Court entered a discharge of debtor on February 23, 2005. H. Yoder Dep. Exh. 23.[7] Finally, on or about December 5, 2005, plaintiffs refinanced the Nation's One loan with a $145,000.00 loan from Long Beach Mortgage Company. Def. Exhs. 32, 33. This adjustable rate loan had an initial interest rate of 7.7% within initial monthly payments of $1,033.79. Def. Exh. 32.

**II.     Plaintiffs' claims**

Plaintiffs have filed a three-count complaint. In Count I, plaintiffs allege that defendants violated ECOA by failing to provide them with a notice of an adverse action taken on their application as required under 15 U.S.C. § 1691(d). In Count II, plaintiffs allege that defendants violated FCRA, because they refused to extend credit and imposed the condition of private mortgage insurance based in part on information contained in a consumer report, but failed to provide plaintiffs with notice regarding the consumer reporting agency as required under 15 U.S.C. § 1681m. In Count III, plaintiffs allege that defendants committed common law fraud when they misrepresented the terms of the permanent loan. Plaintiffs' seek actual damages in the amount of $81,591.86, punitive damages, attorney fees and costs.

**III.     Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[7] Plaintiffs' bankruptcy was re-opened on January 16, 2006 "for the purpose of administering newly discovered assets." H. Yoder Dep. Exh. 24. Neither party has suggested that the re-opening of the bankruptcy requires a stay in this proceeding. Bankruptcy records indicate that the Trustee filed a final distribution report on February 7, 2007.

11

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

## IV. Discussion

### A. The ECOA Claim

The ECOA prohibits credit discrimination, providing that

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction --
>
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);
>
> (2) because all or part of the applicant's income derives from any public assistance program; or
>
> (3) because the applicant has in good faith exercised any right under this chapter.

15 U.S.C. § 1691(a).  The ECOA identifies certain activities that do not constitute discrimination under the act.  *See* 15 U.S.C. § 1691(b)-(c).

The ECOA requires creditors to notify a loan applicant of the reason for an "adverse action" on the credit application within thirty days of the application:

> (1) Within thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.
>
> (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by-
>
>> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
>>
>> (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(1)-(2). The statute defines an "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the same amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). Finally, the ECOA allows individuals to bring a civil action against creditors that fail to comply with the requirements of the act. 15 U.S.C. § 1691e.

"The ECOA's purpose is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." *Midkiff v. Adams County Regional Water District*, 409 F.3d 758, 771 (6th Cir. 2005) (internal quotations omitted). An ECOA case follows the same burden-shifting analysis as employed in Title VII cases (i.e., the *Burdine/McDonnell Douglas* burden shifting framework). *Id.* A prima facie case of credit discrimination under the ECOA requires that an applicant establish: (1) that he or she was a member of a protected class; (2) that he or she applied for credit; (3) that he or she was qualified

for the credit; and (4) that despite his or her qualification for the credit, the creditor denied the credit application. *Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873, 876-77 (6th Cir. 2002).

Plaintiffs allege that defendants' refusal to grant credit on substantially the terms that they requested in the April 10, 2003 application was an adverse action under the ECOA, that defendants failed to provide plaintiffs with a timely notice of adverse action, and that the failure to provide the notice violated the ECOA. Compl. at ¶¶ 19-22.[8] However, plaintiffs fail to allege a prima facie case of credit discrimination under the ECOA because they do not claim to be members of a protected class. *See Midkiff*, 409 F.3d at 772 (the first element of a prima facie case of credit discrimination is that the plaintiff was a member of a protected class); *Mays*, 277 F.3d at 877 (same). Furthermore, plaintiffs cannot claim that they were were denied credit due to Mrs. Yoder's membership in a protected class, i.e., marital status or gender. It is undisputed that they both applied for credit from defendants. When a married couple both apply for credit, they cannot establish a violation of ECOA based solely on the wife's marital status or gender. *See Midkiff*, 409 F.3d 758, 771-73. Plaintiffs have failed to establish a prima facie case of an ECOA violation.

Accordingly, defendants will be granted summary judgment as to Count I.

**B.  FCRA**

In Count II, plaintiffs allege that defendants changed their terms of credit based in part on information contained in a consumer report. Compl. at ¶¶ 25-27. Plaintiffs allege that because defendants acted on this information, they were required to provide certain notice to plaintiffs pursuant to FCRA. *Id.* at ¶ 28. .

---

[8] Plaintiffs do not identify the application by date. However, the terms attributed to the application in the complaint are those as set forth in the April 10, 2003 application. Compl. at ¶¶ 7-10.

14

FCRA provides in relevant part as follows:

If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall--

(1) provide oral, written, or electronic notice of the adverse action to the consumer;

(2) provide to the consumer orally, in writing, or electronically--

> (A) the name, address, and telephone number of the consumer reporting agency (including a toll-free telephone number established by the agency if the agency compiles and maintains files on consumers on a nationwide basis) that furnished the report to the person; and
>
> (B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

(3) provide to the consumer an oral, written, or electronic notice of the consumer's right--

> (A) to obtain, under section 1681j of this title, a free copy of a consumer report on the consumer from the consumer reporting agency referred to in paragraph (2), which notice shall include an indication of the 60-day period under that section for obtaining such a copy; and
>
> (B) to dispute, under section 1681i of this title, with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.

15 U.S.C. § 1681m(a).

The statute, at 15 U.S.C. § 1681a(k) defines an "adverse action" to include an "adverse action" as defined under the ECOA (15 U.S.C. § 1691(d)(6)), various specific actions (not relevant to the present case) and a general "catchall" provision, which defines an "adverse action" as:

15

>   (iv) an action taken or determination that is--
>
>   >   (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 1681b(a)(3)(F)(ii) of this title; and
>   >
>   >   (II) adverse to the interests of the consumer.

15 U.S.C.A. § 1681a(k)(1)(iv). FCRA provides civil liability for any person that "willfully fails to comply with any requirement" and for any person that "is negligent in failing to comply with any requirement" of the act. *See* 15 U.S.C. §§ 1681n, 1681o.

In their complaint, plaintiffs allege that defendants refused to extend credit and imposed the condition of private mortgage insurance (PMI) based in part on information contained in a consumer report, and then failed to provide information pursuant to 15 U.S.C. § 1681m(a). The record reflects that Waterfield obtained credit reports dated May 16, 2003, December 30, 2003 and March 26, 2004.

As an initial matter, plaintiffs' claim that defendants imposed a new condition of PMI is unsupported by the loan documents. The record reflects that plaintiffs' original loan application and Good Faith Estimate reflected a charge for PMI. *See* Def. Exhs. 2, 6. In their response to defendants' motion, plaintiffs contend only that defendants' decision to charge them an interest rate of 7.625% at the closing on June 30, 2004, rather than the interest rate of 4% as set forth in the April 10, 2003 documents, was an "adverse action" under FCRA's catchall provision.

Plaintiff cites no authority to support the proposition that the interest rate charged at the June 30, 2004 closing was an "adverse action" under FCRA. Based on this record, the court concludes that it was not. When plaintiffs applied for a 4.00% interest rate in April 2003, they did not agree to a specific interest rate at that time. Def. Exh. 8. Rather, they chose to play the market

by floating the interest rate and amending the loan financing agreement "prior to closing at a rate and points [defendants] are then offering." *Id.*  Plaintiffs' June 30, 2004 application was part of a subsequent loan application process.  On that date, plaintiffs applied for, and accepted, a different loan based upon their creditworthiness at that time.  Furthermore, even if the parties had agreed to an interest rate in April 2003, the May 15, 2003 Notice loan approval expired long before the parties closed the transaction.

Accordingly, defendants will be granted summary judgment as to Count II.

**C.     State law claim**

In Count III, plaintiffs claim that defendants committed common law fraud, alleging in pertinent part as follows:

34. In connection with the transaction described above, defendants represented to plaintiffs that, when construction of the home was completed, plaintiffs would obtain a 30-year mortgage under specific terms, i.e.: an annual percentage rate of 4.29 percent, and monthly payments for principal and interest that would range from $461.82 to $579.18 for the first seven years and would be $535.18 per month for the remainder of the 30 year [sic] mortgage.

35. Defendants made the representation with the knowledge and expectation that plaintiffs would rely on said representations by executing a construction loan and proceeding with the construction.

36. Plaintiffs did rely on defendants' representations, to their detriment, by executing a loan with the defendants and proceeding with the construction of the home.

37. As a result of their reliance on defendants' misrepresentations, plaintiff [sic] suffered damages including increased finance charges and other costs.

Compl. at ¶¶ 34-37.

Under Michigan law, the plaintiff must show the following elements to establish a prima facie case of fraud:

17

> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976).

"[A]n action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* However, "there can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." *Webb v. First of Michigan Corporation*, 195 Mich. App. 470, 474, 491 N.W.2d 851 (1992). *See, e.g., Evans v. Ameriquest Mortgage Company*, No. 233115, 2003 WL 734169 at *1 (Mich. App. March 4, 2003) ("[b]ecause defendants did not prohibit plaintiffs from reading the documents, plaintiffs cannot claim fraud based on an alleged misrepresentation clearly contradicted by the documents").

### 1.     **Loan documents**

Plaintiffs' fraud claim, which is based upon preliminary documents executed in April 2003, fails as a matter of law because it is contradicted by the loan documents. *See Evans*, 2003 WL 734169 at *1; *Webb*, 195 Mich. App. at 474. None of the April 2003 loan documents bound defendants to provide plaintiffs with a specific interest rate. Def. Exh. 8. On the contrary, plaintiffs chose to have a "floating" interest rate. Plaintiffs amended the original loan financing agreement as contemplated in that agreement. *See* Def. Exhs. 8, 20. The June 30, 2004 addendum to the loan financing agreement, reflected a different transaction, which contained a larger loan amount than either the original loan financing agreement or the May 15, 2003 Notice of Approval. *See* Def.

Exhs. 8, 12, 20. While the preliminary TILA disclosure reflected an APR of 4.429%, plaintiffs could not reasonably rely on that document as establishing the interest rate for the transaction. As the court previously discussed, the preliminary TILA disclosure included a prominent disclaimer that "THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND." Def. Exh. 7. While the Good Faith Estimate was based upon an interest rate of 4.000% and included an estimated monthly payment of $718.83, it was nothing more than an estimate, stating in pertinent part:

> The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less.

Def. Exh. 6.

### 2. Conversation logs

The conversation logs from April 16 and 17, 2003 establish that Waterfield was aware of an error in the buydown provision disclosed to plaintiffs. Based on these logs, Ms. Bennett testified that plaintiffs should have received an end interest rate of 6.0% rather than 4.0% as set forth in the April 2003 loan documents. However, Waterfield's statement of the interest rate in the April 2003 documents cannot support a fraudulent misrepresentation claim under state law. Defendants did not agree to extend credit to plaintiffs at a 4.0% interest rate in April 2003. Any statements regarding interest rates in the April 2003 loan documents did not relate "to a past or an existing fact." *See Hi-Way Motor Co.*, 398 Mich. at 336. Furthermore, plaintiffs present no evidence that defendants knew the interest rate was false when they inserted it in the April 2003 loan documents. *Id.*

**3.     May 15, 2003 Notice of Approval**

Finally, plaintiffs had no basis to rely on the May 15, 2003 Notice of Approval as constituting a fraudulent misrepresentation of the interest rate. It is undisputed that this Notice was prepared after the conversation log entries, and that it included a higher purchase price and loan amount. However, the Notice did not address the interest rate.

Accordingly, defendants will be granted summary judgment as to Count III.

**III.    Conclusion**

For reasons stated above, defendants motion for summary judgment (docket no. 38) will be **GRANTED**. An order consistent with this opinion shall be issued forthwith.


Dated:  February 23, 2007			 /s/ Hugh W. Brenneman, Jr.
						Hugh W. Brenneman, Jr.
						United States Magistrate Judge

20